IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

JAYNE SWINFORD,                      :
                                     :
     Plaintiff,                      :
                                     :      CIVIL ACTION
v.                                   :      No. 3:21-CV-90 (CAR)
                                     :
JOSHUA SANTOS; CHARLES               :
BIDINGER; ROGER WILLIAMS, JR;        :
JONATHAN MCILVANE; RICHARD           :
LEDER; CLAUDE JOHNSON; CHIEF         :
CLEVELAND SPRUILL;                   :
ATHENS-CLARKE COUNTY,                :
GEORGIA;                             :
                                     :
     Defendants.                     :
_____        :

## ORDER ON DEFENDANTS' MOTION TO DISMISS AND PLAINTIFF'S MOTION TO AMEND

Currently before the Court are Plaintiff's Motion to Amend and Defendants'

Motion to Dismiss. Having considered the relevant facts, applicable law, and the parties'

arguments, Defendants' Motion to Dismiss [Doc. 2] is **GRANTED**, and Plaintiff's Motion

to Amend [Doc. 12] is **DENIED as futile** because it fails to state a claim.

## BACKGROUND

Plaintiff Jayne Swinford originally filed this action against the Athens-Clarke

County Unified Government ("ACC") and ACC police officers in the State Court of

Athens-Clarke County, and asserted claims for excessive force and wrongful death after the officers shot and killed her husband, Thomas Swinford ("Swinford").

On March 8, 2019, Athens-Clarke County Police Department ("ACCPD") responded to a call from Thomas Swinford's father who reported Thomas "is on drugs and talked about killing himself"[1] and "threaten[ed] suicide by cop."[2] Before the incident, ACCPD had responded to three prior suicide threats involving Swinford.[3]

When officers arrived at the Swinford residence, they notified dispatch that Swinford was armed—although the gun was actually a BB gun pistol—and ACCPD dispatched additional officers to help establish a perimeter in response to the report.[4] Swinford fled the scene in a vehicle, which officers attempted to disable with spike strips, but Swinford was able to drive the car to a nearby parking lot where a standoff with police ensued. The standoff ultimately ended when the officers shot and killed Swinford.

Defendants Joshua Santos, Charles Bidinger, Roger Williams, Jr., Jonathan McIlvane, Richard Leder, Claude Johnson, William Greenlow (collectively, the "Individual Officers"); Chief Cleveland Spruill; and ACC timely removed the action to this Court and moved to dismiss Plaintiff's Complaint. Thereafter, Plaintiff filed a motion to amend her Complaint.

---

[1] Plaintiff's Complaint, Doc. 1-1 ¶ 27.
[2] *Id*. at ¶ 29.
[3] *Id*. at ¶ 28.
[4] *Id*. at ¶ 31.

## LEGAL STANDARD

The Court analyzes Plaintiff's Motion to Amend under Federal Rule of Civil Procedure 15(a).[5] Because more than twenty-one days have passed since Plaintiff served her original Complaint and Defendants oppose the Motion, Plaintiff may only amend her complaint with leave of Court. In such circumstances, leave of court should be "freely give[n] when justice so requires."[6]

The decision whether to grant leave to amend a complaint is within the sound discretion of the district court.[7] Reasons justifying a denial of a timely filed motion for leave to amend include "undue delay, bad faith, dilatory motive on the part of the movant, [ ] undue prejudice to the opposing party by virtue of allowance of the amendment [and] futility of allowance of the amendment."[8] The standard for futility is akin to a motion to dismiss; a proposed amendment may be denied for futility "when the complaint as amended would still be properly dismissed."[9]

On a motion to dismiss, the Court must construe the complaint in the light most favorable to the plaintiff and accept as true all well-pled facts in a plaintiff's complaint.[10] To avoid dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint

---

[5] Under Rule 15(a), a party may amend its pleading "once as a matter of course" within twenty-one days of serving it.

[6] *Id.*; *Nat'l Indep. Theatre Exhibitors, Inc. v. Charter Fin. Grp., Inc.*, 747 F.2d 1396, 1404 (11th Cir. 1984).

[7] *Nat'l Serv. Indus., Inc. v. Vafla Corp.*, 694 F.2d 246, 249 (11th Cir. 1982).

[8] *Foman v. Davis*, 371 U.S. 178, 182 (1962).

[9] *Coventry First, LLC v. McCarty*, 605 F.3d 865, 870 (11th Cir. 2010) (citing *Cockrell*, 510 F.3d at 1310).

[10] *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009).

must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[11] A claim is plausible where the plaintiff alleges factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[12] The plausibility standard requires that a plaintiff allege sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" that supports a plaintiff's claims.[13]

## DISCUSSION

For the reasons discussed herein, Plaintiff's original Complaint and Amended Complaint fail to state a viable claim against ACC, and the bodycam footage conclusively demonstrates the individual Defendants are entitled to qualified immunity. Thus, Defendants' Motion to Dismiss is **GRANTED,** and Plaintiff's Motion to Amend is **DENIED** as futile.

### I.   § 1983 Excessive Force Claims

Plaintiff asserts excessive force claims under the Fourth Amendment against the Individual Officers in their individual capacities and a supervisory liability claim against Chief Spruill individually.[14] Because bodycam footage demonstrates the

---

[11] *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).
[12] *Id.*
[13] *Twombly,* 550 U.S. 544, 556 (2007).
[14] Plaintiff's original Complaint asserts claims for "Fourth and Fourteenth Amendment Violation[s]," but "All claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *See Graham v. Connor,* 490 U.S. 386, 395 (1989); *Hunter v. City of Leeds,* 941 F.3d 1265, 1278-79 (11th Cir. 2019).

Individual Officers are entitled to qualified immunity, and Plaintiff failed to state a claim for supervisory liability against Spruill, both claims must be dismissed.

### A. Claims Against Individual Officers

In her original complaint, Plaintiff alleges the following. When Swinford exited his vehicle in the parking lot, a standoff ensued.[15] At least fifteen officers surrounded Swinford with their guns drawn, and "[f]or approximately twenty minutes, ACCPD personnel used a loudspeaker system to repeatedly command [Swinford] to put down his 'gun.'"[16] Swinford informed officers he would "come out" if he was permitted to speak to his wife, but officers prevented him from doing so.[17]

None of the officers deployed were equipped with "less lethal" weapons, but officers allegedly stated "[w]e're going to need [a less lethal weapon] […] as soon as you can get one back here."[18] Although officers ordered Swinford to drop the gun, they did not issue a warning of their intention to use deadly force if he failed to comply.[19]

Despite the officer's instructions to drop the gun, Swinford "walked [towards the officers] and raised the alleged 'handgun' […] toward a patrol vehicle shielding two

---

[15] Plaintiff's Complaint, [Doc. 1-1] at ¶ 43.

[16] *Id*. at ¶ 43-45.

[17] *Id*. at ¶ 47.

[18] *Id*. at ¶ 48-50.

[19] *Id*. at ¶ 52.

ACCPD Officers."[20] The Individual Officers shot at Swinford twenty-one times and "continued to fire upon him when he was flat on his face in the parking lot."[21] Swinford was struck six times and died from his injuries.[22]

Plaintiff contends the Individual Officers "lacked a reason to believe that [Swinford] was armed or dangerous" or if the Individual Officers had such reason it was lacking when the Individual Officers engaged in "contagious fire"; the Individual Officers "had no probable cause to believe that [Swinford] posed a threat of serious physical harm to either the officers or others" and thus, violated Swinford's constitutional rights and clearly established law.[23]

Plaintiff's allegations in the Amended Complaint are materially similar to those in her original Complaint. In the Amended Complaint, Plaintiff alleges ACCPD ignored their policy which "required" ACCPD to deploy a specialized team.[24] Plaintiff alleges the officers were "behind cover and protected from a threat of death or injury."[25] Plaintiff alleges the Individual Officers fired at Swinford after he "was already on the ground defenseless and far out of reach of the BB pistol," thus, using "gratuitous lethal force."[26]

---

[20] *Id*. at ¶ 54-55.
[21] *Id*. at ¶ 59.
[22] *Id*. at ¶ 66-67.
[23] *Id*. at ¶ 86-101.
[24] Plaintiff's Proposed Amended Complaint, [Doc. 12-2] at ¶ 42.
[25] *Id*. at ¶ 68.
[26] *Id*. at ¶ 58, 69-71.

Plaintiff alleges liability on the basis that officers fired upon Swinford "despite a serious crime or threat of danger," the Individual Officers shot Swinford after he was "non-resisting and subdued," and "the Officers ha[d] more than sufficient time to stop shooting in response to any perceived threat presented by the BB pistol he previously held."[27]

Officers at the scene were wearing body cameras that recorded the event. Although Plaintiff directly references the bodycam videos in her Complaint, she did not submit any of the videos. Defendants filed the bodycam footage with their Motion to Dismiss and with their Response to Plaintiff's Motion to Amend.[28]

i.   <u>Bodycam Footage</u>

The allegations in Plaintiff's original Complaint and Amended Complaint are wholly contradicted by the bodycam footage. Despite Plaintiff's argument to the contrary, the Court may consider the bodycam videos attached to Defendants' motions in ruling on the Motion to Dismiss and the Motion to Amend. The Eleventh Circuit has adopted the "incorporation by reference" doctrine, by which a court may use extrinsic evidence without converting a motion to dismiss into a motion for summary judgment when "a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its

---

[27] *Id*.
[28] Defendant's Motion to Dismiss, Exhibits A and B [Doc. 2-2]; Defendants' Response to Plaintiff's Motion to Amend, Exhibits C and D, [Docs. 14-3, 14-4].

motion to dismiss."[29] Throughout her original Complaint, Plaintiff directly references the bodycam footage—including an entire section titled "Comprehensive Facts from Bodycam Videos and Reports."[30] In the Amended Complaint, Plaintiff removed most direct references to the bodycam footage. But Plaintiff adopts her expert's report—which directly relies on the bodycam footage—by reference and incorporates it in her complaint.[31]

Plaintiff's argument that the contents of the bodycam videos are in dispute fails. "'[U]ndisputed' means that the authenticity of the document is not challenged."[32] Plaintiff does not dispute the authenticity of the video—only the completeness. But, the Court need not consider hours of bodycam footage for the footage to be complete or "undisputed." Defendants supplied the Court with certified bodycam footage, obtained from ACC through an open records request, depicting the Individual Officers' use of deadly force—the moment central to Plaintiff's claims.

---

[29] *Davis v. Clayton*, No. 7:17-cv-02076-LSC, 2018 U.S. Dist. LEXIS 120666, at *6-7 (N.D. Ala. July 19, 2018) (citing *Financial Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007) (concluding the bodycam footage attached to Defendant's motion to dismiss was incorporated by reference in Plaintiff's complaint and could be considered by the Court)); *see also Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002).

[30] Plaintiff's Complaint, [Doc. 1-1] at p. 9; *See also* ¶ 26, 60.

[31] Plaintiff's Motion to Amend, [Doc. 12-1] at fn. 1 (*See Generally* Pl.'s Expert Report, adopted herein by reference as Exhibit "B"); *Id.* at p. 7 ("Plaintiff adopts her proposed "First Amended Complaint" herewith as an exhibit; and, adopts all averments in her "First Amended Complaint" herein […]. Plaintiff also adopts all conclusions and findings in the "Expert Report" of William Harmening herein, which is proposed to be filed as an exhibit to her First Amended Complaint."); Exhibit B – Expert Report, [Doc. 12-3], at p.7 ("The report that follows was completed using the following: […] All officer body cam videos."). Plaintiff's expert also cites to specific time markers in the bodycam videos, some of which share almost identical titles to the videos filed by Defendants. *Id.* at fns. 1, 2, 3; p. 13, 17.

[32] *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).

"When the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern."[33] Where the video "obviously contradicts [Plaintiff's] version of the facts, [the Court] accept[s] the video's depiction instead of [Plaintiff's] account,"[34] and "view[] the facts in the light depicted by the videotape."[35] The Court views any ambiguities in the light most favorable to Plaintiff. Because Plaintiff failed to articulate a cognizable argument to dispute the authenticity of the attached videos, the videos are central to Plaintiff's claims, and the videos are incorporated by reference in Plaintiff's original and Amended Complaints, the Court may consider the videos in ruling on both motions.[36]

The bodycam footage demonstrates the following.[37] For almost three minutes[38] before the Individual Officers shot Swinford, an officer repeatedly ordered Swinford to "put the gun down," "raise your hands above your head," "put down the gun and talk with me," and "put your hands up and come to the front of the vehicle."[39] During the

---

[33] *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007).

[34] *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010).

[35] *Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

[36] *See McDowell v. Gonzalez*, 820 F. App'x 989, 992 (11th Cir. 2020) ("In reviewing McDowell's complaint to determine whether it should be dismissed under Rule 12(b)(6), the district court properly considered both the amended complaint and body camera footage that was attached to the motion to dismiss because the body camera footage was central to the amended complaint and was undisputed.").

[37] Defendant's Motion to Dismiss, Exhibits A and B [Doc. 2-2]; Defendants' Response to Plaintiff's Motion to Amend, Exhibits C and D, [Docs. 14-3, 14-4].

[38] Referring to the three minutes before the shooting in the bodycam footage. Plaintiff's Complaint, however, alleges "[f]or approximately twenty minutes, ACCPD personnel used a loudspeaker system to repeatedly command Thomas to put down his 'gun.'"

[39] Exhibit A [Doc. 2-2] at 0:25 to 3:24; Exhibit D [Doc. 14-4] at 0:00 to 0:28.

exchange, two officers discussed how the bystanders across the street "are still in range of that pistol. [...] We can't force them, but we can highly encourage them to at least back up."[40] One officer then approaches the bystanders and explains "our concern is this man is armed with a gun and y'all are in almost a direct line [of fire]."

Over the loudspeaker, the officer tells Swinford, "I know you want some help, and we can get that help for you. I know your [inaudible] family is thinking about you. They want to know you're alright,"[41] "I know there's a lot going on man, but we can work this out. We can work through it," "you've got to give us a chance," and "I know you might be feeling alone, but you're not."[42]

Despite the officer's orders to put the gun down and raise his hands, Swinford walked towards the officers with the gun in his hand while the officer yelled "don't do that Thomas" and "drop the gun" multiple times.[43]  Seconds later, Swinford raised the gun and pointed it at the officers.[44] The officers then fired at him.[45] Over a four to five second interval, the Individual Officers fired multiple shots, six of which struck Swinford.[46] After the shooting stopped, officers ordered Swinford to "stay down" and

---

[40] Exhibit B [Doc. 2-2] at 0:06 to 1:22.
[41] Exhibit A [Doc. 2-2] at 0:36 to 0:53.
[42] Exhibit A [Doc. 2-2] at 2:37 to 3:14; Exhibit D [Doc. 14-4] at 1:30 to 2:07.
[43] Exhibit A [Doc. 2-2] at 3:17 to 3:25; Exhibit D [Doc. 14-4] at 2:09 to 2:18.
[44] *Id*.
[45] Exhibit A [Doc. 2-2] at 3:22 to 3:25; Exhibit D [Doc. 14-4] at 2:15 to 2:21.
[46] Exhibit A [Doc. 2-2] at 3:25 to 3:28; Exhibit D [Doc. 14-4] at 2:17 to 2:21.

"don't move";[47] one officer asked "where is the gun?" to which another officer responded, "it's right there in front of him."[48] As a team of officers approached Swinford, another officer instructs them to "slow down," "do not rush him," and "secure him."[49]

### ii.   Qualified Immunity

The bodycam footage establishes the Individual Officers are entitled to qualified immunity, and Plaintiff's claims against them must be dismissed. In cases brought under §1983, qualified immunity "offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[50]

Qualified immunity shields "all but the plainly incompetent or those who knowingly violate the law."[51] The Eleventh Circuit has adopted a multi-step, burden shifting analysis for qualified immunity:

> In order to receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. . . . Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate.[52]

---

[47] Exhibit A [Doc. 2-2] at 3:33 to 3:43.

[48] Exhibit D [Doc. 14-4] at 2:24 to 2:30.

[49] Exhibit A [Doc. 2-2] at 0:00 to 0:28; Exhibit C [Doc. 14-3] at 0:51 to 0:58.

[50] *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[51] *Gates v. Khokhar*, 884 F.3d 1290, 1296 (11th Cir. 2018) (citation omitted).

[52] *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citations and internal quotation marks omitted).

The Individual Officers were undoubtedly acting within the scope of their discretionary authority in responding to the Swinford family's 911 calls and later pursuing Swinford.[53] Thus, Plaintiff must state sufficient facts to show the Individual Officers use of force violated clearly established law or "that the violation was so obvious that every reasonable officer would know that his actions were unconstitutional."[54] She fails to carry her burden.

Whether an officer's use of deadly force was reasonable turns on "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."[55] The "standard asks whether the force applied 'is objectively reasonable in light of the facts confronting the officer,' a determination [the Court] make[s] 'from the perspective of a reasonable officer on the scene' and not 'with the 20/20 vision of hindsight.'"[56]

To determine whether a suspect poses an imminent threat to the safety of officers or others, the Court asks "whether, given the circumstances, [Swinford] would have appeared to reasonable police officers to have been gravely dangerous."[57] The Eleventh

---

[53] *Crosby v. Monroe Cty.*, 394 F.3d 1328 (11th Cir. 2004).

[54] *Washington v. Warden*, 847 F. App'x 734, 737 (11th Cir. 2021).

[55] *Hunter*, 941 F.3d at 1279 (quoting *Graham*, 490 U.S. at 396).

[56] *Mobley v. Palm Beach Cty. Sheriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015) (citing *Crenshaw v. Lister,* 556 F.3d 1283, 1290 (11th Cir. 2009)).

[57] *Long*, 508 F.3d at 581 (quoting *Pace v. Capobianco*, 283 F.3d 1275, 1281 (11th Cir. 2002)).

Circuit views this factor as the most important, and the Circuit has consistently held that "where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officers or others, use of deadly force does not violate the Constitution."[58] In other words, "[i]t is axiomatic that when an officer is threatened with deadly force, he may respond with deadly force to protect himself."[59]

Here, the bodycam footage shows, the Individual Officers' use of deadly force was objectively reasonable under the clearly established law. The officers responded to a report of an armed individual, observed Swinford behaving erratically, and ordered him repeatedly to put down the gun. Officers recognized the danger of the situation, both in how they attempted to shield themselves from potential fire and by warning bystanders that they were in the line of fire. Swinford escalated an already gravely dangerous situation when he refused to comply with the officer's orders, walked towards the officers, raised the gun, and aimed towards them.[60]

Although Plaintiff's Complaint concedes officers ordered Swinford to put down the gun for approximately twenty minutes, Eleventh Circuit precedent indicates officers

---

[58] *Penley*, 605 F.3d at 851 (citing *Garner*, 471 U.S. at 11).
[59] *Hunter*, 941 F.3d at 1279.
[60] The officer's statements over the loudspeaker illustrate the officers attempts to deescalate the situation and reason with Swinford. The Individual Officers did not use deadly force until the moment they encountered Swinford's perceived use of deadly force.

were not required to wait until Swinford had "[taken aim at] officer[s] or others before using deadly force"[61] because "[t]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."[62] Both Swinford's behavior before he raised the gun—and by pointing the gun directly at officers—supports the Court's conclusion that, under the circumstances, Swinford would have appeared to have been gravely dangerous to a reasonable police officer. During the four seconds of shooting, and even after Swinford fell to the ground, his head was still raised, his body appeared to move, and officers had not yet located the gun. Plaintiff's argument that no officer was at risk of injury from possible gun fire because they were behind vehicles, walls, trees, or shields is without merit.

The seriousness of Swinford's conduct, along with his failure to follow the officers' commands, also supports a finding of reasonableness. The first officer to arrive on scene observed Swinford retreat into the house holding a firearm and advised dispatch that he was armed. Swinford was behaving erratically, brandishing a gun,[63] and when the officers made contact, he failed to comply with the officers' commands to "drop the gun"

---

[61] *Thorkelson v. Marceno*, 849 F. App'x 879, 882 (11th Cir. 2021) (citing *Montoute v. Carr*, 114 F.3d 181, 185 (11th Cir. 1997)).

[62] *Jean-Baptiste v. Gutierrez*, 627 F.3d at 821 (citing *Long*, 508 F.3d at 581).

[63] The gun was later determined to be a BB gun, but there is nothing in the record to support the Individual Officers knew Swinford was not brandishing a "real" gun before he was shot. On the contrary, the reports to dispatch, precautions taken by the officers, and recorded communications between officers, Swinford, and civilian bystanders establish the officers believed Swinford was armed with a "real" gun.

and "put [his] hands up." Instead, Swinford walked towards the officers, raised his gun, and pointed it at them.

Even viewing ambiguities in the bodycam footage and well-plead factual allegations in a light most favorable to Plaintiff, precedent dictates that the Individual Officers used reasonable force. The Eleventh Circuit has held officers were entitled to qualified immunity where a decedent "had time to comply with [an officer's] command . . . but instead he defied the officer's command by turning back toward the gun lying in the open trailer doorway: a movement the officers reasonably perceived as threatening."[64] Additionally, the Eleventh Circuit has found that "threatening the lives of others, and refusing to comply with officers' commands to drop the weapon are undoubtedly serious crimes," and  concluded "non-compliance of this sort supports the conclusion that use of deadly force was reasonable".[65] Thus, the Individual Officers are entitled to qualified immunity, and Plaintiff's claims against them—in both her original and Amended Complaints—are **DISMISSED**.

---

[64] *Mercado v. City of Orlando*, 407 F.3d 1152, 1154-57 (11th Cir. 2005); *see e.g. Kenning v. Carli*, 648 F. App'x 763, 770-71 (11th Cir. 2016) (citing *Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016).
[65] *Compare Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011) (finding that use of force was unreasonable in part because "[d]isorderly conduct is not a serious offense" and the plaintiff "did not ignore any verbal instructions"), with *Penley*, 605 F.3d at 851 (holding that "threatening the lives of others, and refusing to comply with officers' commands to drop the weapon are undoubtedly serious crimes," and "non-compliance of this sort supports the conclusion that use of deadly force was reasonable").

B.  Supervisory Liability Claim—Chief Spruill

Plaintiff asserts a supervisory liability claim against Chief Spruill. But, "[i]t is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability."[66] "To hold a supervisor liable a plaintiff must show that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and the alleged constitutional violation."[67] "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous."[68]

Plaintiff failed to plead facts to show that Spruill either directly participated in the unconstitutional conduct or that a causal connection exists between Spruill's actions and the alleged constitutional violation. Instead, Plaintiff asserts multiple conclusory allegations devoid of factual support. In her original Complaint, Plaintiff alleges Spruill, "knew, or should have known, of the repeated threats of suicide by Swinford";[69] "was to ensure the deployment of the Department's Strategic Response Team"[70]; "was tasked with ensuring that ACCPD personnel were equipped with less lethal […] means";[71]

---

[66] *Keith v. Dekalb Cty.*, 749 F.3d 1034, 1047 (11th Cir. 2014) (citing *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (internal quotation marks omitted)).

[67] *Id.* at 1047-48.

[68] *Cottone*, 326 F.3d at 1360.

[69] Plaintiff's Complaint, Doc. 1-1 at ¶ 79.

[70] *Id.* at ¶ 80.

[71] *Id.* at ¶ 81.

"Spruill is liable to Plaintiff based on his failure to perform the ministerial task to deploy the Strategic Response Team in accordance with ACCPD's stated policy 'requiring' it to do so";[72] "Spruill failed to take reasonable steps to protect Swinford from Defendants' use of excessive force";[73] and "[i]n the alternative, Spruill is liable to Plaintiff for the performance of discretionary duties with malice or intent to injure Swinford"[74].

In the Amended Complaint, Plaintiff continues to assert conclusory allegations which are either devoid of factual support or misrepresent documents in the record.[75] Plaintiff focuses on deficiencies in ACCPD's crisis response systems and training, and alleges Spruill: "was aware of the tactical dispatching deficiency identified by CALEA 2016 relating to the ACCPD Communication Division's lack of participation in tactical dispatch communications operations"; "had knowledge of [Swinford's previous suicide threats]"; "ignored the deficiencies and did nothing until [Swinford's death]"; "directed subordinates to act unlawfully"; "knew that his subordinated would act unlawfully and failed to stop them from doing so"; and "is liable [...] based on a causal connection

---

[72] *Id*. at ¶ 83.

[73] *Id*. at ¶ 84.

[74] *Id*. at ¶ 85.

[75] For the same reasons the Court can consider the attached bodycam footage, the Court can also consider the attached 2016 CALEA Report. *Compare* Plaintiff's Amended Complaint [Doc 12-2] at ¶ 208 *with* 2016 CALEA Report, [Doc. 14-1] at p. 29-30. The 2016 CALEA report noted that ACCPD was in compliance with all CALEA standards except one which is not relevant to Plaintiff's case. Plaintiff's claim that the 2016 report "confirmed a deficiency with 'Tactical Dispatching'" is unfounded and a misrepresents the report's findings.

between his deliberate indifference to ACCPD's deficiencies and the violation of [Swinford's] constitutional rights." [76]

None of Plaintiff's allegations meets the "extremely rigorous" standard established by the Eleventh Circuit.  Additionally, Plaintiff cannot rely on his allegation that Spruill breached department policy by failing to deploy the Strategic Response Team to state a supervisor liability claim. "[N]o cases hold that a government official's violation of facility or department policy, without more, constitutes a constitutional violation."[77] Furthermore, there is no constitutional right to have a specially trained response team deployed. Thus, Plaintiff failed to state a supervisor liability claim against Spruill, and her claim must be **DISMISSED**.

II.    **Claim Against ACC**

Plaintiff fails to state a claim against ACC[78] because she fails to allege "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."[79] The original Complaint provides no factual basis to support Plaintiff's conclusory allegations against ACC. In the Complaint, Plaintiff alleges that ACC "employed customs or policies that constituted deliberate indifference to Plaintiff's

---

[76] Plaintiff's Amended Complaint, [Doc. 12-2] at
[77] *Dolihite v. Maughon by & Through Videon*, 74 F.3d 1027, 1044 (11th Cir. 1996).
[78] In her original complaint, Plaintiff asserts duplicative *Monell* claims against both ACC and Spruill in his official capacity. *See McMillian v. Monroe County*, 520 U.S. 781 (1997) (a suit against an individual in his official capacity is the functional equivalent of a suit against the government entity the official represents).
[79] *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

Constitution [sic] Rights"; "implemented policies, directives, ordinances, regulations, or decisions officially adopted and promulgated by Chief Spruill and ACC resulting in the violation of Plaintiff's Constitutional Rights"; "engaged in unofficial customs or practices shown through the repeated acts of the Chief of Police and County Commissioners, who acted as final policymakers for the city"; "ACC and Spruill's customs and practices were the moving force behind the constitutional violations identified in this Complaint"; "ACC and Spruill are liable based on a pattern of similar conduct to the conduct in this case, including, but not limited to, prior shooting incidents involving those with mental illness or threats of suicide"; and multiple boilerplate failure to train allegations.[80]

The allegations in Plaintiff's Amended Complaint shift from a bare and factually devoid recitation of the elements of a *Monell* liability claim to allegations of ACC's failure to train and supervise, departmental deficiencies, and deliberate indifference to Swinford's constitutional rights. Plaintiff alleges ACC "was aware of deficiencies with ACCPD's crisis response capabilities involving persons in need of mental health treatment" and of the "limited training opportunities for direct responders to individuals in crisis"; "given the prior notice of deficiencies directly related to the deployment of [specialized] teams [...] the likelihood for constitutional violation[s] was so high that [...] the need for corrective training and supervision was patently obvious"; and alleges ACC is liable "based on their deliberate indifference to the very high

---

[80] Plaintiff's Original Complaint, [Doc. 1-1] at ¶ 114-123.

likelihood for constitutional violations and the resulting violation of [Swinford's] rights", or in the alternative, "based on evidence of [Swinford's prior incidents] involving the need for mental health crisis intervention and effective tactical deployment" and "for hiring Spruill."[81]

A local government entity may not be found liable under § 1983 for an injury inflicted solely by its employees or agents, even when that injury results in a constitutional violation.[82] Instead, a local government entity "is liable only when [its] 'official policy' causes a constitutional violation."[83]  To establish this, a plaintiff must "identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county."[84]

Plaintiff's allegations are mere recitations of the bare elements of a *Monell* claim and only offer conclusory allegations devoid of factual support. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[85] Additionally, the vague allegations fail to "specifically identify

---

[81] Plaintiff's Amended Complaint [Doc. 12-2] at ¶ 205-235.

[82] *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 694 (1978).

[83] *Id.*

[84] *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003).

[85] *Ashcroft v. Iqbal* , 556 U.S. 662, 687 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)) (internal citations omitted).

which policy or practice, if any, caused the alleged injuries."[86] "Alleging vaguely that a policy, custom or practice exists is not enough; rather plaintiff must specifically identify which policy or practice, if any, caused the alleged injuries."[87] Additionally, an allegation of an isolated incident, without more, is insufficient to establish *Monell* liability.[88]

Plaintiff's failure to train allegations of likewise fail. "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."[89]

> The Supreme Court has explained that there are only "limited circumstances" in which an allegation of a failure to train or supervise can be the basis for liability under § 1983. The Supreme Court has instructed that these "limited circumstances" occur only where the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy, and that city policy causes the employees to violate a citizen's constitutional rights.[90]

The Eleventh Circuit has "repeatedly has held that without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise."[91] For example, the Eleventh Circuit concluded "a sheriff's

---

[86] *Searcy v. Ben Hill Cnty. Sch. Dist.*, 22 F. Supp. 3d 1333, 1341 (M.D. Ga. 2014) (internal quotation marks and citation omitted).
[87] *Id*.
[88] *Grech,* 335 F.3d at 1330, n.6 (2003) (quoting *City of Oklahoma v. Tuttle,* 471 U.S. 808, 823-24 (1985) ("A single incident would not be so pervasive as to be a custom or practice" and "proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*.").
[89] *Bd. of Cnty. Com'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 405 (1997).
[90] *Gold v. City of Miami,* 151 F.3d 1346, 1350 (11th Cir. 1998) (internal citations omitted).
[91] *Id*. at 1351.

department was not liable for a deputy's acts when 'no evidence of a history of widespread prior abuse … put the sheriff on notice of the need for improved training or supervision.'"[92] Plaintiff makes no allegations of widespread history of excessive force, let alone a specific widespread history of excessive force resulting from interactions with mentally ill or intoxicated individuals. Thus, Plaintiff's failure to train allegations fail to establish liability for ACC.

Plaintiff's *Monell* claims fail to state a claim and fail to meet the pleading requirements set forth in FRCP Rule 8. Therefore, her claims must be **DISMISSED**.

## III.   Americans with Disabilities Act ("ADA") Claim

Plaintiff also seeks to amend her complaint to add a claim for damages under Title II of the ADA. In the Amended Complaint, Plaintiff alleges "Swinford was an individual with a disability due to mental illness involving suicidal ideations"; ACC was aware Swinford's prior incidents and therefore on notice he required an accommodation; all ACCPD personnel present "were aware Swinford was mentally ill and therefore legally required to be treated as an individual with a disability pursuant to the ADA"; "ACC's […] had access to the special teams that were required and available to be deployed to handle an incident involving a mentally ill and suicidal individual"; and ACC and Spruill

---

[92] *Id.* (citing *Wright v. Sheppard*, 919 F.2d 665 (11th Cir. 1990)). *See also Popham v. City of Talladega*, 908 F.2d 1561, 1564-65 (11th Cir.1990) (finding no liability for failure to train when no pattern of incidents put the City on notice of a need to train).

were deliberately indifferent to the risk of an ADA violation by failing to deploy the Strategic Response Team and the Crisis Intervention Team.[93]

Title II of the ADA prohibits a "public entity" from discriminating against "a qualified individual with a disability" on account of the individual's disability, as follows:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.[94]

To state a claim under Title II, plaintiff must allege (1) that the decedent was a qualified individual with a disability; (2) that the decedent was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the decedent's disability.[95] In the ordinary course, proof of a Title II violation entitles a plaintiff only to injunctive relief.[96]

The Eleventh Circuit "has never addressed whether police officers can violate Title II of the ADA."[97] But "assuming, arguendo, that such a claim is cognizable, [the Eleventh Circuit has] held that a plaintiff seeking compensatory damages under the ADA must

---

[93] Plaintiff's Proposed Amended Complaint, [Doc. 12-2] at ¶ 236-254.

[94] 42 U.S.C. § 12132.

[95] *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1083 (11th Cir. 2007).

[96] *Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 831 (11th Cir. 2017).

[97] *Osorio v. Miami Dade Cty.*, 717 F. App'x 957 (11th Cir. 2018) (per curiam).

show 'discriminatory intent.'"[98] A plaintiff may prove discriminatory intent by showing that a defendant was deliberately indifferent to his statutory rights. Deliberate indifference is an exacting standard, which requires showing more than gross negligence.[99]  It requires proof that "the defendant knew that harm to a federally protected right was substantially likely and . . . failed to act on that likelihood."[100]

To hold ACC liable, Plaintiff must demonstrate that an "official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the [ACC's] behalf" had "actual knowledge of discrimination in the [ACC's] programs and fail[ed] adequately to respond."[101] To qualify, that "official" must be "high enough up the chain-of-command that his [or her] acts constitute an official decision by [ACC] not to remedy the misconduct."[102]

Plaintiff fails to allege sufficient facts to support Spruill had actual knowledge that ACCPD's dispatch program discriminated against mentally ill individuals in deciding whether to deploy specially trained teams or that he failed adequately to respond. Plaintiff does not allege Spruill knew that deploying the Individual Officers, rather than

---

[98] *Id. See also McCullum v. Orlando Reg'l Healthcare Sys.*, 768 F.3d 1135, 1147 (11th Cir. 2014) (To prevail on a claim for compensatory damages under the ADA, a plaintiff must show that a defendant violated his rights under the statutes and did so with discriminatory intent).

[99] *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019).

[100] *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 344 (11th Cir. 2012) (citation omitted). See also *Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.") (internal citations omitted).

[101] *Silberman*, 927 F.3d at 1134 (citations omitted).

[102] *Id*.

a specialized team, would "substantially likely" result in harm to a federally protected right. Furthermore, Plaintiff fails to cite to any case law supporting the proposition Swinford was legally entitled to have the Strategic Response Team or the Crisis Negotiation Team deployed, or that these two teams were the only ADA-compliant manner ACCPD could encounter an individual with a mental illness. Because Plaintiff's Amended Complaint fails to establish a *prima facie* case for a both a violation under Title II of the ADA and the required showing of discriminatory intent, her claim for damages fails on both grounds.

## IV.    State Law Wrongful Death Claim

With all federal claims dismissed, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law wrongful death claim. "A district court may decline to exercise supplemental jurisdiction if it 'has dismissed all claims over which it has original jurisdiction.'"[103] Furthermore, the Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial[.]"[104] Thus, Plaintiff's wrongful death claim is **DISMISSED without prejudice**.

---

[103] *Marshall v. Washington*, 487 F. App'x 523, 527 (11th Cir. 2012) (citing 28 U.S.C. § 1367(c)(3)).
[104] *Id.* (citing *Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004)).

**CONCLUSION**

Based on the foregoing, Defendants' Motion to Dismiss [Doc. 2] is **GRANTED**, and Plaintiff's Motion to Amend [Doc. 12] is **DENIED as futile** because it fails to state a claim.

**SO ORDERED,** this 31st day of March, 2022.

s/ C. Ashley Royal

C. ASHLEY ROYAL, SENIOR JUDGE
UNITED STATES DISTRICT COURT