IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | |
|---|---|
| JAYNE' SWINFORD,<br><br>        Plaintiff,<br><br>vs.<br><br>JOSHUA SANTOS, CHARLES BIDINGER, ROGER WILLIAMS, JR., JONATHAN MCILVAINE, RICHARD LEDER, CLAUDE JOHNSON, WILLIAM GREENLOW, CHIEF CLEVELAND SPRUILL, ATHENS-CLARKE COUNTY, GEORGIA<br><br>        Defendants. | 3:21-CV-00090-CAR |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR RECONSIDERATION[1]

### INTRODUCTION

*After* ACCPD Officers shot and killed Thomas Swinford, Defendant Johnson said, "We probably shouldn't have shot him." Even though that admission was dispositive to the Court's futility analysis, it was not acknowledged.

---

[1] Local Rule 7.6 references deadlines and page limitations "with the exception of motions filed pursuant to Fed. R. Civ. P 59(e)." It appears to Plaintiff that the Local Rule's exception clearly applies to extend the time for filing this motion from 14 to 28 days. It is not equally clear that it excepts her brief from a page limit of only 5 pages. As such, despite the number of issues raised by the Court's Order, Plaintiff has aggressively edited her brief down as best she could in service of judicial economy; and, since she may not be entitled to submit a reply brief, hopes the Court will consider scheduling a hearing on her motion. That will ensure that all issues are addressed in the trial court before an appeal, if an appeal is ultimately filed.

Johnson's admission was one of numerous dispositive or critically important matters of Record that appear to have been overlooked, or disregarded, by the Court in reaching its decision to dismiss Plaintiff's claims of excessive force.[2]   It is equally concerning that the Court *did* expressly consider:  a) the "original complaint" that was abandoned; b) unauthenticated and incomplete bodycam videos taken by only 2 of the 7 above-named Officers who shot Swinford[3]; and, c) the actions of Defendants collectively, rather than individually.   In addition to her excessive force claims,  Plaintiff's other Federal claims were similarly dismissed,

---

[2]      See, e.g.,  proposed amended complaint (Doc. 12-2) at ¶ 50 ("BB pistol"); ¶ 51 ("behind the cover"); ¶ 52 ("dropped…one shot"); ¶ 53 ("behind brick wall"); ¶ 56 ("3 shots…subdued"); ¶ 57 ("behind cover"); ¶ ("2 shots…already down"); ¶ 59 ("behind the cover"); ¶ 62 ("fired…after…already defenseless"); ¶ 63 ("We probably shouldn't have shot him."); ¶ 65 ("three..shots…already defenseless"); ¶ 67 ("three shots…taken…already defenseless and far out of reach of BB pistol"); ¶ 68 ("without a threat…civilians"); ¶ 69 ("fired…after…fully subdued and non-resistant"); ¶ 71 ("bullet wounds to Thomas back…after he was non-resistant"); ¶ 73 ("gunshot wounds to Thomas' back were included as "evidence of injury" contributing to…death."); ¶ 78("ordered to disengage"); ¶ 86("Santos admitted that Thomas…did not have a good target on any Officers"); ¶ 89 ("threat to himself and no one else")

See Harmening Report (Doc-12-3) at p. 14 ("no less lethal"); at p. 14 ("McIlvaine admitted that he dropped Swinford with one shot, leaving him defenseless, face-down on the pavement with the gun far out of his reach, while other officers continued to fire upon Swinford."); at p. 14-15 ("unable to see any of the other officers…remaining three shots were all taken after Thomas was already on the ground"); at p. 15 ("review of the [Santos] video shows…last two shots were taken while Thomas was already on the ground."); at p. 15 ("fired the second time after Thomas was already on the ground."); at p. 16 ("three..shots…after Thomas was already on the ground."); at p. 16 ("all three shots were taken well after Thomas was already on the ground and were ethe final shots taken. Bidinger's final shot was 5 seconds after the initial…"); at p. 18 ("a perceptual gap of as little as 1-2 tenths of a second between a change in stimulus and an officer's ability to perceive the change."); at p. 18 ("12 of the 22 shots fired occurred after Thomas was already on the ground.")

[3] See Affidavit of William Harmening, attached hereto as Exhibit "A", in regard to his reference to "all videos" that encompassed each of the 7 bodycam videos from each Officer who shot Swinford, rather than the videos submitted by Defendants.

even though they were plausible "as amended."[4]   Prior to dismissal, Plaintiff was

denied any opportunity to obtain initial disclosures, pre-discovery, or discovery

relating to her claims or any motions.   Notwithstanding, she has obtained newly

discovered open records that directly relate to, and strongly support, all of her

claims.   The records confirm that Plaintiff must be afforded her right to have a

jury decide her claims in accordance with the 7th Amendment, rather than

Judgment as a matter of law.   Therefore, reconsideration of the Court's Judgment

is equally warranted on the ground of newly discovered evidence.

1. The Court committed a separate reversible error each time it considered
   Plaintiff's "original complaint."

The Court correctly stated that the "standard for futility is akin to a motion

to dismiss; **a proposed amendment** may be denied for futility when the

**complaint as amended** would still properly be dismissed."   Since Plaintiff did not

adopt her "original complaint", this rule necessarily required treatment of the

original complaint as "abandoned by the amendment, and [no] longer a part of the

---

[4] "We review de novo the dismissal of a complaint for failure to state a claim under Rule 12(b)(6) of the Federal
Rules of Civil Procedure; we accept all factual allegations as true and consider them in the light most favorable to
the plaintiff. We review the denial of a motion to amend for an abuse of discretion, but whether the motion is futile
is a question of law that we review de novo.. A district court's "denial of leave to amend is justified by futility when
the complaint as amended is still subject to dismissal."   Brooks v. Warden, 800 F.3d 1295, 1300 (11th Cir. 2015)

pleader's averments against his adversary."[5] Notwithstanding, in its Order, the Court referenced the "original complaint" **34 times**, which necessarily resulted in 34 reversible errors requiring reconsideration of the Court's decision.

2. The Court erred by failing to conduct an individualized analysis of the qualified immunity claims of multiple Defendants.

According to the 11th Circuit, the failure to conduct an individualized analysis of the use of force of multiple defendants claiming qualified immunity constitutes reversible error.   In particular, a district court must analyze "only the actions…in which that particular defendant engaged."[6]   Here, without the respective bodycam videos of each Officer who shot Swinford, the Court had no means to analyze their claims of qualified immunity individually.   As such, the Court clearly framed its findings in collective terms.[7]   That was both inappropriate

---

[5] Dresdner Bank AG, Dresdner Bank AG in Hamburg v. M/V OLYMPIA VOYAGER, 463 F.3d 1210, 1215 (11th Cir. 2006)

[6] "Because courts are required to perform an independent qualified immunity analysis for each defendant, id., we reverse the district court's denial of summary judgment and remand for the district court to conduct an independent assessment of each Defendant's actions to determine whether each Defendant is entitled to qualified immunity." Norris v. Williams, 776 Fed. Appx. 619, 622 (11th Cir. 2019)(emphasis added); See also Berry v. Kight, 6:18-CV-132, 2020 WL 1493954, at *5 (S.D. Ga. Mar. 24, 2020) for an example of a District Court's individualized analysis.

[7] "When *officers* arrived at the Swinford residence…" [Doc. 17 at 2]; "The standoff ultimately ended when the *officers* shot and killed Swinford." [Doc. 17 at 2]; "The Individual *Officers* shot at Swinford twenty-one times…" [Doc. 17 at 6]

4

and unnecessary, since the complaint "as amended" already adopted the use-of-force analysis by Plaintiff's expert, William Harmening.

Harmening reviewed the bodycam videos of each of the seven Officers who shot Swinford ("all videos"); and, analyzed each round of shots they fired, respectively. [8]   His recitation of facts was required to be taken as true at the stage of dismissal because they were part of the complaint "as amended."   On reconsideration, Plaintiff requests that the Court afford Harmening's report with the deference required by law relating to both facts and reasonable inferences related to them.   At the very least, Plaintiff is entitled to an individualized analysis by the Court of the actions of each Officer based on their 7 respective bodycam videos since that is also what the law requires.

3.  <u>The Court's consideration of two bodycam videos taken by Officers who shot Swinford, rather than all seven, was both errant and unfair.</u>

The Court considered bodycam videos and documents presented by Defendants , at the stage of dismissal, by citing to the "incorporation by reference" doctrine.   It did so over Plaintiff's express objections; and, without any notice to Plaintiff of its intention to do so.   The Court erred when it did so without, at minimum, affording Plaintiff an opportunity to supplement what Defendants

---

[8] See Affidavit of William Harmening adopted by reference and attached hereto as Exhibit "A"

presented; and, given the importance the Court placed upon the bodycam videos, its decision was unfair to Plaintiff under the circumstances.

For purposes of clarification, Plaintiff presumes that Defendants' "clips" of bodycam videos were excised from the same bodycam videos viewed by Plaintiff; but, she understood that Defendants could only "present" the Court with bodycam videos, or anything else, by way of a stipulation to authenticity; or, satisfactory evidence of authenticity.   Plaintiff could not possibly stipulate to the Court's consideration of 4 "clips" showing the perspectives of 2 Officers who shot Swinford, rather than all 7 who shot him, simply because that does not present the Court with the complete picture.    Furthermore, Plaintiff thought she had adequately established in the Record that Defendants had failed to meet their burden to authenticate evidence with a "Certification" for "attached" videos that were not, in fact, "attached"; or, even identified.

Whether Plaintiff's objections appearing of Record are semantically construed by the Court as objections to "authenticity" or "completeness", the bottom line is that Defendants did *not* present the reports and videos forming the basis of Plaintiff's claims that were cited to in the Rule 26 Report of Plaintiff's expert witness.  Instead, Defendants presented a mere portion of the reports and videos; and, only the portions they wanted the Court to see at the exclusion of the rest.  Under those circumstances, Plaintiff anticipated that the Court would a)

exclude the evidence Defendants presented in the absence of proper evidence of authentication or completeness; b) convert the motion under Rule 12; or, at the very minimum, c) provide Plaintiff with the opportunity to supplement what was already presented to ensure it was considered in proper context. Plaintiff's expectation in that regard was based on Rule 12, the Federal Rules of Evidence, and the 11th Circuit's holding in Horsley.

First, Plaintiff read the "incorporation by reference" doctrine in conjunction with the Federal Rules of Evidence, which includes Rule 106 relating to "completeness." In particular, "[I]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."[9] In light of that rule, Plaintiff did not anticipate that the Court might consider bodycam videos she had expressly disputed because "the conversion clause of Rule 12(c) would be too easily circumvented and disputed documents attached to an answer would have to be taken as true at the pleadings stage."[10] Furthermore, given the Rule's express reference to "fairness", Plaintiff did not anticipate that the Court would deem it fair

---

[9] FRE Rule 106

[10] Horsley v. Feldt, 304 F.3d 1125, 1135 (11th Cir. 2002)

to consider matters presented by Defendants without affording Plaintiff an opportunity file what may be needed to present the Court with the full picture, rather than Defendants' favorite corner of it.

Next, Plaintiff understood <u>Horsley</u> to be controlling here based on the demarcation it established in regard to application of the "incorporation by reference doctrine."   By analyzing two separate documents, <u>Horsley</u> illustrated the difference between a) something expressly cited to in a complaint and exactly the same thing that was cited; and,  b) something referenced in a complaint and disputed on the grounds it contains mere "excerpts" of what was cited to in a complaint, at best.[11]   In this case, again, since Defendants only presented 2 of 7 bodycam videos of Defendants who shot Swinford, Plaintiff anticipated that her objection was not only appropriate, but dispositive, to ensure that the Court did not adjudicate multiple Defendants' claims of qualified immunity in the absence of the evidence necessary to analyze them.

Since Plaintiff was not afforded the "reasonable opportunity to present all material made pertinent to such a motion by Rule 56"; and, since this issue was

---

[11] "They do not contain the statements the complaint insists that Feldt made, and for all we know at this stage those statements were left out of the excerpts. **Because the authenticity of the transcripts attached to the amended answer is disputed, and because they are not complete transcripts of all of Ms. Feldt's statements in the broadcast, they may not be considered in deciding the Rule 12(c) motion for judgment on the pleadings**." <u>Horsley v. Feldt</u>, 304 F.3d 1125, 1135 (11th Cir. 2002) (emphasis added)

crucial to the Court's decision to dismiss her claims, Plaintiff requests the Court's reconsideration.[12]

4.    _Hunter v. City of Leeds_

This Court applies the same rule that Plaintiff relied upon in pleading her excessive force claims in the first place:

> _There is substantial case authority in the Supreme Court and this Circuit clearly establishing that harming a suspect after that suspect is compliant, cooperative, under control, or otherwise subdued is gratuitous and, therefore constitutionally excessive...even in a case...when a previously fractious arrestee ceases all resistance at the time the force is exerted._[13]

The 11th Circuit's application of this rule is best illustrated by Hunter v. City of Leeds. Hunter was an armed suspect who fled from police and commanded to drop his gun by an officer named Kirk; but, instead of dropping it, Hunter pointed his gun at Kirk. Kirk then fired an **initial round of shots** at Hunter, causing Hunter to drop his weapon. Kirk was immune from suit for the initial shots he fired, as a matter of law, because "it is axiomatic that when an officer is threatened with deadly force, he may respond with deadly force to protect himself"; and,

---

[12] Horsley v. Feldt, 304 F.3d 1125, 1134 (11th Cir. 2002)

[13] Cross v. Lacey., 3:14-CV-18, Doc. 18 at 14. (2015)

9

"…at the **summary judgmen**t stage, Kirk did not violate Hunter's Fourth

Amendment rights when he fired his **first three shots** at Hunter."

The 11th Circuit next considered whether additional rounds of shots fired

<u>after</u> Hunter dropped his weapon were similarly subject to summary adjudication.[14]

It conducted a separate analysis of shots fired after the gun was dropped, while

explaining that "the allowable level of continued force thus diminishes with the

threat."[15]    In conducting a *de novo* review, the Court found that Hunter "dropped

his gun…Kirk then, without further warning, fired seven more shots at Hunter,

who was now unarmed."  Under those circumstances, the Court held "a reasonable

jury could find that Kirk's **continued** use of deadly force was no longer

proportionate to the danger presented, and thus his second round of shots

constituted excessive force in violation of the Fourth Amendment."[16]

---

[14] "Ultimately, a jury must resolve the fact question regarding how many times Hunter pointed his weapon at Kirk …we must analyze the officers' entitlement to qualified immunity under the factual scenario that is most favorable to Hunter…Hunter pointed his weapon at Kirk upon arriving at his residence, Kirk fired three shots at Hunter in response, Hunter then dropped his weapon…Kirk nonetheless fired several more shots at Hunter…while he was unarmed."  <u>Hunter v. Leeds, City of</u>, 941 F.3d 1265, 1277 (11th Cir. 2019)

[15] "…while the use of deadly force may initially be justified, the level of force that is reasonable may change during the course of a police encounter. See, e.g., <u>Glasscox v. City of Argo</u>, 903 F.3d 1207, 1214 (11th Cir. 2018). "Graham dictates unambiguously that the force used by a police officer ... must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." Lee, 284 F.3d at 1198. The allowable level of continued force thus diminishes with the threat.  <u>Hunter v. Leeds, City of</u>, 941 F.3d 1265, 1280 (11th Cir. 2019)

[16] Hunter was decided after the Swinford incident on March 8, 2019; but, Hunter is no less applicable and controlling here because the rule cited in <u>Hunter</u> had been "clearly established" for years prior to the Swinford incident.   Second, "the use of deadly force against a suspect who, though initially dangerous, **has been disarmed** or otherwise become non-dangerous, is conduct that lies "so obviously at the very core of what the Fourth

The facts presented by <u>Hunter</u> are indistinguishable from the case, *sub judice*.  Like Hunter, Swinford was told to drop his weapon; but, instead of doing so, he raised it.   At that point, *arguendo*, ACCPD Officers "had probable cause to believe that [Swinford] posed a threat of serious physical harm, either to the officer or to others."   According to Defendant McIlvaine, in response to what he alleged to be a reasonable lethal threat, he subdued and disarmed Swinford by "dropping him" with one shot.[17]  Swinford "dropped his gun" after the initial round of shots fired by McIlvaine, just as Hunter did.   According to McIlvaine's bodycam video and his interviews, when  McIlvaine "dropped" Swinford, Swinford fell face first on the pavement and dropped his gun out of his reach.[18]  *At that moment*, before 20 or 21 additional shots were fired at him, Swinford was already disarmed; and, at least 12 of those shots were fired at Swinford when he was visibly prone and subdued.   Like Hunter, additional rounds of shots were fired when Swinford was

---

Amendment prohibits that the unlawfulness of the conduct [is] readily apparent." <u>Hunter</u> at 1278–81 (11th Cir. 2019)

[17] According to McIlvaine's body cam video, referenced in the complaint "as amended", McIlvaine fired 2 shots, stopping as Swinford dropped, while additional rounds of shots continued to ring out for as many as 4-5 seconds.

[18] Even the videos presented by Defendants and viewed by the Court over Plaintiff's multiple objections reflected that Swinford's BB Gun was far out of his reach when he was "dropped."  See Doc. 15: Defendant's Exhibit "D" at 3:00 min, which clearly shows that Swinford's BB gun was at least 6 feet out of his reach when he was approached by Defendant Johnson after he was shot.   It is noteworthy that Defendants redacted their "clip" of Johnson's video to eliminate Johnson's dispositive vicarious admission  "We probably shouldn't have shot him."

11

"not actively resisting arrest, nor attempting to charge or otherwise threaten" any officers.

In <u>Hunter</u>, the Court found that the additional **7 shots** fired after Hunter dropped the gun were not susceptible to **summary adjudication** on the issue of excessive force.  This case is far less susceptible to judgment as a matter of law because it was decided at **dismissal**, rather than summary judgment; **12 shots** were fired after the BB Gun was dropped; and, medical evidence confirmed that Swinford was **shot in the back twice**.

5.    <u>Newly Discovered Evidence</u>

In supplementation of well-pled averments appearing of Record "as amended", for purposes of reconsideration, Plaintiff submits newly acquired evidence herewith that was obtained via open records requests as recently as April 14, 2022.[19]   The records confirm that ACCPD was **required** to deploy its "Co-Responder Team" (or "Crisis Intervention Team")  in response to the 911 calls relating to Thomas' threat to commit suicide by police.[20]

---

[19] Plaintiff requests that the Court take judicial notice of the open records received from ACCPD for purposes of reconsideration.

[20] Plaintiff hopes the records will also provide the Court cause to revisit its conclusion that Plaintiff misrepresented the 2016 CALEA report. (or anything else)  It is memorialized of Record that Plaintiff based her contention on the fact that **ACCPD did not have a "tactical dispatch team to support police department tactical operations"** in 2016. (page 12)  Plaintiff described that as a "deficiency", in her own words, because:

> *The Athens-Clarke County Police Department Central Communications Division does not participate in tactical dispatch operations.  According to the ACC communications administrator, **the agency hopes to***

### A. Co-Responder "Pathway"

Thomas Swinford's family called 911 to request ACCPD's help to save

Thomas' life when he threatened to commit suicide; and, in particular, to attempt

to commit suicide by police.   The "pathway" of communications obtained in open

records clearly reflects that the 911 dispatcher should have then contacted the "Co-

responder team:  ACC police officer & mental health specialist" in response to

those calls.   The failure on March 8, 2019 to do so relates to each and every one of

Plaintiff's claims; and, when treated in a light most favorable to Plaintiff, further

shows that the Court erred in adjudging them as a matter of law.

### B. 2016 Planning Initiative

In 2016, a "multidisciplinary team" associated with the "ACC Justice and

Mental Health Collaborative Planning Initiative" ("JMHC") expressly identified

"specific barriers to be addressed which include…**breakdowns in**

**interdepartmental communication within the context of crisis response**, and

limited training opportunities for direct responders to individuals in crisis."

---

*implement a tactical dispatcher program by the end of 2016, to work closely with the police department's Strategic Response Team (SRT).  It is believed that this program would be mutually beneficial by allowing dispatchers to gain a better understanding of what goes on in the field and by providing the SRT direct field support.*  Doc. 14-1 at 29-30

Plaintiff intentionally used the term "deficiency", rather than CALEA's term for noncompliance ("standards issues"), to distinguish Plaintiff's contentions from CALEA's  While Defendants alleged that the "hope" to implement a tactical dispatcher program came true, and they may very well be correct, there is literally no way for Plaintiff to know that without initial disclosures or discovery.   All the Swinfords know is that the SRT was never dispatched on March 8, 2019 to help save Thomas' life using the less-lethal measures they were trained to use.

### C. 2017 JMHC Implementation and Expansion

According to the JMHC, "the most ubiquitous gap in our local infrastructure is the **communication barriers that exists among all agencies/programs, thus resulting in [confusion.]**" Furthermore, **"mitigating, and over time eliminating, communication barriers is imperative…between behavioral health and justice-related agencies for the purpose of coordinating support…"** These "gaps" were proposed to be redressed "by implementing a Co-responder program that will encompass a partnership between ACC Police Department and Advantage…the newly formed crisis intervention response unit has been tracking every interaction with a suspected behavioral health consumer for a three-month span." Also, a "licensed Advantage clinician will work within the police department's office space. **The Co-Responder's primary responsibility shall be to respond alongside a Law Enforcement Officer on calls when mental illness is identified as a factor.**" As Plaintiff has made attempt to explain to the Court from the start:

> *The Co-responder may also be contacted by central communications dispatchers or police officers directly…once a scene is secured by law enforcement, the Co-responder **shall** provide crisis intervention on-*

*scene…this may include but is not limited to:  de-escalation techniques,*

*assessment of mental status and* ***suicide risk***…[21]

*D. Crisis Intervention Response Unit*

In July 2017, ACCPD issued a "training bulletin" relating to the "Crisis

Intervention Response Unit" that was allegedly "formed in August 2016."

According to ACCPD, "The goals set forth by the unit are to link individuals and

their family's to needed resources that may be available to the person suffering

from a Mental health Crisis **and intervening before the crisis escalates**."  The

bulletin proves that, at all times relevant to this case, the Unit was "available in the

office M-F 8-4, however **can be reached after hours via supervisor approval**";

and, **the Unit "is available to officers when responding to a mental health type**

**call…**"

*E.  Spruill was ACC's "designated official"*

In dismissing Plaintiff's claims, the Court cited to Plaintiff's burden to

establish "that a causal connection exists between Spruill's actions and the alleged

constitutional violation."  According to the correspondence provided through an

open records request, Defendant Spruill was designated as the "programmatic

---

[21] ACCPD had inarguably "secured the scene" to allow for the Co-responder team's involvement following the first barricade.  See Doc. 12-2 ¶ 32 ("ACCPD Officers at the Swinford residence were then advised by dispatch to "clear the area"; and, told Thomas that he was **not subject to arrest because he had committed no crime**.")

POC" for purposes of the JMHC after he took over as Chief on February 4, 2019.
This establishes Spruill as "the official who at a minimum has authority to address
the alleged discrimination and institute corrective measures" because he is "high
enough up the chain-of-command that his [or her] acts constitute an official
decision by [ACC] not to remedy the misconduct."

   *F. Policy issued after Swinford was killed.*

   Plaintiff is entitled to the inference that, even before the Swinford shooting,
Spruill knew of the need for implementation of policies relating to handling mental
illness 911 calls.   This is true because, shortly after the Swinford incident, Spruill
issued an ACCPD directive relating to those with mental illness and therefore
"present a danger to themselves or others."   The directive, issued only weeks after
Swinford was killed,  outlines the things ACCPD did *not* do on March 8, 2019,
even though ACCPD had "repeat problems" of suicidal threats by Swinford prior
to that date:

-   Eliminate emergency lights

-   Assume a quiet non-threatening manner

-   Athens-Clarke County employees should be aware of available community
    health resources in the area (including "Suicide Prevention Lifeline")

-   "If problems arise while trying to access resources officers should notify the
    Crisis Intervention Unit"

- "Crisis Intervention Unit will assist the department with **repeat problems**"

G.    *Mental Health Collaboration Grant*

Before Swinford was killed, in 2018, an ACC agenda item for the Commission referenced funding in conjunction with "the use of a co-responder service delivery model in which it is proposed that **a licensed clinician will respond alongside an ACCPD officer on calls when mental illness is identified as a factor…this outreach provides a face-to-face professional assessment of immediate safety and risk of the individual involved.**"   It cited to requests made for hundreds of thousands of dollars for "implementation of a co-responder model in conjunction with Advantage Behavior Health Systems"; and, the recommendation for such expenditures was made to "**protect lives.**"

<u>CONCLUSION</u>

Plaintiff respectfully requests reconsideration of the Court's Judgment on the foregoing grounds; and, for such amendment, correction, or relief related to the Judgment afforded by Rule 59(e) and deemed appropriate under the circumstances to redress manifest error and newly discovered evidence.

[Signature Appears on Following Page]

17

Respectfully submitted this 28th day of April, 2022.

**BAKER & SLIDER, LLC**

/s/ John Hollis Baker, Esq.
**John Hollis Baker, Esq.**
Counsel for Plaintiff
Georgia Bar No. 033797
298 E. Washington St.
Athens, GA 30601
(706) 208-1514
John@Georgialawyerteam.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically submitted the foregoing MOTION FOR RECONSIDERATION to the Clerk of Court using the CM/ECF system which will automatically send electronic mail notification of such filing to counsel of record who are CM/ECF participants. Counsel of record are:

Sun S. Choy                         Sara E. Brochstein
Georgia Bar No. 025148              Georgia Bar No. 446366
schoy@fmglaw.com                    sbrochstein@fmglaw.com

Respectfully submitted this 28th day of April, 2022.

**Baker & Slider, LLC**

/s/ John Hollis Baker, Esq.
**John Hollis Baker, Esq.**
Counsel for Plaintiff
Georgia Bar No. 033797
298 E. Washington St.
Athens, GA 30601
(706) 208-1514
John@Georgialawyerteam.com